```
                      UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY

SYMED LABS LIMITED, et al.,      .
                                 .
         Plaintiffs,             .
                                 .  Case No. 15-cv-08304
vs.                              .
                                 .  Newark, New Jersey
ROXANE LABORATORIES, INC.,       .  December 16, 2016
                                 .
         Defendant.              .
_____  .

SYMED LABS LIMITED, et al.,      .
                                 .
         Plaintiffs,             .  Case No. 15-cv-08307
                                 .
vs.                              .
                                 .
AMNEAL PHARMACEUTICALS LLC,      .
                                 .
         Defendant.              .
_____  .
                                 .
SYMED LABS LIMITED, et al.,      .
                                 .
         Plaintiffs,             .  Case No. 15-cv-08306
                                 .
vs.                              .
                                 .
GLENMARK PHARMACEUTICALS         .
INC., USA,                       .
                                 .
         Defendant.              .
_____
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

```
Audio Operator:
Transcription Service:      KING TRANSCRIPTION SERVICES
                            3 South Corporate Drive, Suite 203
                            Riverdale, NJ  07457
                            (973) 237-6080
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   (APPEARANCES continued)

 2   For the Plaintiffs:      CHRISTINA LYNN SAVERIANO, ESQ.
                              Hill Wallack, LLP
 3                            21 Roszel Road
                              Princeton, NJ 08543
 4                            (609) 734-6395
                              csaveriano@hillwallack.com
 5
                              MARK S. GRAHAM, ESQ.
 6                            The Graham Law Firm PLLC
                              507 South Gay Street, Suite 1230,
 7                            Knoxville, TN 37902
                              (865) 633-0331
 8

 9   For the Defendant        BETH S. ROSE, ESQ.
     Roxane                   Sills Cummis & Gross P.C.
10   Laboratories, Inc.:      One Riverfront Plaza
                              Newark, NJ 07102-5400
11                            (973) 643-7000
                              brose@sillscummis.com
12
                              EMILY C. MELVIN, ESQ.
13                            Latham & Watkins
                              330 North Wabash Avenue, Suite 2800
14                            Chicago, IL 60611
                              (312) 876-7645
15                            Emily.melvin@lw.com

16
     For the Defendant        ANANDITA VYAKARNAM, ESQ.
17   Amneal                   Budd Larner PC
     Pharmaceuticals          150 John F. Kennedy Parkway
18   LLC:                     Short Hills, NJ 07078
                              (973) 315-4421
19                            avyakarnam@buddlarner.com

20
     For the Defendant        JAMES S. RICHTER, ESQ.
21   Glenmark                 Winston & Strawn, LLP
     Pharmaceuticals          The Legal Center
22   Inc., USA:               One Riverfront Plaza
                              7th Floor
23                            Newark, NJ 07102
                              (973) 848-7676
24                            Jrichter@winston.com

25
```

```
 1   (APPEARANCES continued)

 2                          IVAN M. POULLAOS, ESQ.
                           Winston & Strawn LLP
 3                         35 W. Wacker Drive
                           Chicago, IL 60601-9703
 4                         (312) 558-7962

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Commencement of proceedings at 12:15 P.M.)

2

3              THE COURT:  Okay.  This is Symed Labs and Hetero

4    USA -- and Hetero USA versus Roxanne, 15-8304; Symed Labs and

5    Hetero versus Glenmark, 15-8306; and Symed Labs and Hetero

6    versus Amneal, 15-8307.

7              I wonder if counsel could put their appearances on

8    the record, please.

9              MS. SAVERIANO:  Good morning, Your Honor, Christy

10   Saveriano from Hill Wallack on behalf of the plaintiffs.

11             THE COURT:  Oh, yeah.

12             MR. GRAHAM:  Mark Graham, the Graham Law Firm on

13   behalf of plaintiffs.

14             THE COURT:  Okay.

15             MR. RICHTER:  Good morning, Your Honor, James

16   Richter of Winston & Strawn on behalf of Glenmark

17   Pharmaceuticals.

18             And with me today is Ivan Poullaos also from

19   Winston & Strawn.

20             MS. MELVIN:  Good morning, Your Honor, Emily Melvin

21   from Latham  & Watkins on behalf of Roxane.

22             THE COURT:  Okay.

23             MS. VYAKARNAM:  Good morning, Your Honor, Anandita

24   Vyakarnam from Budd Larner for Amneal Pharmaceuticals.

25             MS. ROSE:  Good morning, Your Honor, Beth Rose from

1    Sills Cummis on behalf of Roxane.

2              THE COURT:  Okay.  Thank you.

3              We have a number of things to deal with this

4    morning.  And I received a lot of correspondence.  And I

5    thought it's time to do this officially on the record.  And I

6    want to repeat the history of what has occurred here and then

7    get to the issues.

8              So I'm going to start with that, and then of course

9    I'll hear from you.

10             But the last conference that we had was held on

11   October 26th.  And since that date, I've received, I think,

12   seven letters, the most recent being about 5:30 or so

13   yesterday afternoon, something like that.

14             Basically, this is a patent infringement case.

15   Plaintiffs are the owners by assignment of four patents

16   covering a product with line Linezolid -- I don't know how to

17   pronounce that, so you can help me with that.  But the

18   product Zyvox; it's an antibiotic.  The cases are

19   consolidated for discovery.

20             Fact discovery presently closes on July 24th, 2017.

21   And I guess pursuant to the operative scheduling order, which

22   is the fifth amended scheduling order, the parties are

23   currently exchanging proposed claim constructions and

24   supporting evidence.

25             As I said, the last conference was October 26th.  I

1   hadn't heard anything or any problems with the case or

2   anything for some time before that.  The day before the

3   conference, I got a letter from defendant Roxane, really on

4   behalf of all defendants, raising a dispute over the terms of

5   a proposed discovery confidentiality order.  The issue had

6   been raised in August 2016, but I didn't hear anything from

7   the parties, and the parties did nothing about it, to my

8   knowledge, until October 25th, the day before the conference.

9        Defendants wanted the order to include certain

10  provisions relating to the access to confidential information

11  and highly confidential information; not an uncommon dispute

12  in these types of cases.

13       I directed the parties to -- the plaintiffs to

14  respond to the October 25th submission by November 9th.

15       No timely response was submitted, but eventually on

16  November 22nd, plaintiffs requested until November 29th to

17  respond.  For some reason, it wasn't neither granted nor

18  denied, and there was reference to it in some of the papers

19  filed by the defendants as being waived and things like that,

20  but ultimately plaintiffs did put in a responsive letter on

21  November 30th.  And defendants contend I shouldn't even

22  consider the letter because it was late.  And I'm certainly

23  going to use my discretion to consider it, notwithstanding

24  the fact it was late, and also because we need the issues

25  decided on the merits here in this important patent case.

1          So that the parties can't agree on a DCO.  Both

2     parties seem to agree that the DCO should have two tiers of

3     protected information: confidential and highly confidential

4     information.

5          However, the defendants have apparently requested

6     the entry of a discovery confidentiality order that has three

7     extra provisions.  The defendants want to preclude any

8     nonattorneys from seeing any protected information,

9     confidential and highly confidential, exchanged in the case.

10    I mean -- which is a very broad request, although it does

11    occur in certain patent cases.

12         Defendants want in-counsel's [*sic*] access limited

13    to confidential information -- in-house counsel's, meaning

14    that they can't review highly confidential information.

15         And, three, if we permit, if the Court permits

16    in-house counsel access to highly confidential information,

17    defendants want an in-house -- the in-house counsel to be

18    permanently barred from competitive decision-making related

19    to the technology and products underlying the patents.

20         Now, plaintiff's responsive letter states that it

21    should be entitled to a discovery confidentiality order that

22    allows disclosure of all highly confidential material to at

23    least two individuals, who are identified as John Thallemer,

24    Esquire, in-house U.S. patent counsel, and Mr. Suresh Reddy,

25    who is Symed's Indian-based patent agent.

1     So the dispute raises a question of access that has

2  been discussed in some case law, that's referred to somewhat

3  fleetingly in the letters, a Federal Circuit case, United

4  States Steel v. U.S., 730 F.2d 1465, and In re Deutsche Bank

5  Trust, 605 F.3d 1373.  U.S. Steel involved access to

6  confidential documents under a protective order.  In re

7  Deutsche Bank discussed both the question of access and also

8  the -- specifically the patent prosecution bar.  And the

9  general principles, I'm going to review, because I think it

10  goes to what we do here.

11     But with respect to access to confidential and

12  highly confidential information, the party seeking the

13  protective order carries the burden of showing good cause for

14  its issuance.  And the same is true for a party seeking to

15  include access provisions in a DCO.  That's Deutsche Bank at

16  page 1378.

17     Now, counsel can't be denied to access to

18  confidential information solely on the grounds that they hold

19  the general position of in-house counsel.  That's also

20  Deutsche Bank and U.S. Steel at page 1378; U.S. Steel at

21  1467.  The question of access turns on whether there is an

22  opportunity for inadvertent disclosure, which must be

23  determined by the facts on a counsel-by-counsel basis.  In re

24  Deutsche Bank at 1378; U.S. Steel at 1467.  The

25  counsel-by-counsel determination should turn on the extent to

1    which counsel is involved in competitive decision-making with

2    the client.   *In re Deutsche Bank*, the same pages, and U.S.

3    Steel.

4            Competitive decision-making is, quote, a shorthand

5    for a counsel's activities, association, and relationship

6    with a client that are such as to involve counsel's advice

7    and participation in any or all of the client's decisions,

8    (pricing, product design, things like that), made in light of

9    similar or corresponding information about a competitor.

10           So that's really with regard to access.   There's a

11   lot of law -- I'm not going to read through all of it -- when

12   it comes to a patent prosecution bar that some of it's the

13   same thing.   And basically, they say, for example, in

14   Deutsche Bank says it's very important for the court in

15   assessing the propriety of the exemption for patent

16   prosecution bar and also I think this applies to the access

17   as well, to examine all of the relevant facts surrounding the

18   counsel's actual preparation and prosecution activities on a

19   counsel-by-counsel basis.

20           And, I mean, it goes on and on, and really, I think

21   you're familiar with the cases that -- let me just see here.

22   And I think it's -- the case that I think is somewhat helpful

23   is a case called Front Row Technologies LLC v. NBA Media

24   Ventures, 125 F. Supp. 3rd 1260.   I'm going to quote from it:

25   The majority of courts first require the movant to show that

1   there's an unacceptable risk of inadvertent disclosure of

2   confidential information determined by the extent to which

3   counsel is involved in competitive decision-making with its

4   client.  The movant must demonstrate this risk on a

5   counsel-by-counsel basis.  Second, the movant must show that

6   the proposed prosecution bar is reasonable in scope.  And

7   then only after these steps are complete, does the burden

8   shift to the nonmovant.  The party seeking an exception to

9   bar must show that counsel's representation of the client in

10  matters before the PTO does not and is not likely to

11  implicate competitive decision-making related to the subject

12  matter of the litigation so as to give rise to inadvertent

13  use of confidential information.  And also to consider the

14  potential injury to the moving party from restrictions

15  imposed on its choice of litigation and prosecution counsel

16  outweighs the potential for injury to the opposing party

17  caused by such inadvertent use.

18          So that's sort of a general statement of the legal

19  standards of access and also patent prosecution bars.

20          So then we come to the issue before us, the

21  analysis.  And frankly, I struggled with it based on the

22  papers that were submitted.  I mean, I'll note right at the

23  outset that there were no affidavits submitted.  And I don't

24  know anywhere, there's a lot of cases that I can cite to you

25  where they rely on affidavits, more detailed affidavits

1   rather than just general conclusions.  I don't know that's --

2   you know, that's not a requirement in the law, but, you

3   know -- so when we get to the question of access, like I

4   said, it's a case-by-case, attorney-by-attorney inquiry.  I

5   mean, I think that the defendants have, you know, certainly

6   established the basic issue here that we're dealing with

7   highly confidential material and things like that.

8          So, you know, I think that they argue -- the

9   defendants argue there's a high likelihood of economic injury

10  because the parties are direct competitors for the sale of

11  the generic product, and they claim that -- defendants claim

12  plaintiffs want to disclose the information to individuals

13  who are involved in technical development of the active

14  pharmaceutical ingredient in the case, the API.

15         Specifically, defendant alleges plaintiffs have a

16  pending patent application involving the product in the

17  United States, which involves the same inventors as the

18  Patent-in-Suit.  And since everyone's competing in the

19  market, as well as the pending application, they claim the

20  risk of injury is high and that the potential for misuse is

21  too great.

22         And they also claim that it's disclosure of the

23  highly confidential information to in-house counsel is

24  unnecessary and should be prohibited, you know, based on the

25  risk of inadvertent disclosure.  And defendants argue that

1   plaintiffs have essentially admitted that their in-house

2   counsel intends to engage in the use of information for the

3   development of products, you know, to compete with the same

4   API.  So the argument there is defendants contend that

5   intentional or not, in-house counsel will not be able to

6   separate or wall off in their mind highly confidential

7   information reviewed in the case and that plaintiffs should

8   be able to proceed with the case with only outside counsel

9   and experts reviewing.

10          Now, plaintiff -- then we come to the plaintiff's

11  response, and it's problematic to me.  But the plaintiff's

12  response doesn't focus on the specific terms that should or

13  should not be included in the DCO.  The letter simply states

14  in a conclusory fashion that it should be entitled to a DCO

15  that allows disclosure of all confidential material to at

16  least two individuals, John Thallemer, who is in-house U.S.

17  patent counsel, and Mr. Suresh Reddy.  And plaintiffs

18  state -- and they do so conclusory, in a certain way, that

19  these individuals are not involved in competitive

20  decision-making.

21          But the letter submitted, which, once again, was a

22  letter, not an affidavit, which I think would be more

23  appropriate in something like this, is devoid of any

24  specifics, any substance about the activities of these two

25  individuals.  It just says what they are and that they're

1   not, you know, involved in competitive decision-making.

2           Well, you know, I think that it's a case where a

3   access -- I think the defendants have established that

4   access -- it would be appropriate to limit access in this

5   case.  However, I'm not willing to have this broad access, at

6   least not at this point, restriction that seems to be asked

7   for at the outset, to anyone.  Anyone who's not a lawyer --

8   you know.

9           So I'm going to -- you know, I'm going to give you

10  another chance, actually, plaintiffs.  The Court's required

11  to evaluate on a counsel-by-counsel basis, the risk of

12  inadvertent disclosure, which turns on whether -- I've

13  already said this -- the individuals involved are competitive

14  decision-makers.

15          I got a few sentences in the letter saying they're

16  not.  And there's, you know -- there's no information there.

17  There's no meat on the bones.  There's no details.  Who are

18  these people?  What are their jobs?  What do they do?  Have

19  they ever engaged in this, that, and the other thing?  And I

20  think that, really, you need to show that.  I mean, at this

21  point, I'm going to -- you know, things will remain

22  restricted, but I'm not inclined to have a complete

23  restriction.  But I need some details.  And I don't have the

24  details.  I'll cite the case of Sanofi-Aventis v.

25  Breckenridge, which a New Jersey case, 2016 WL 308795, where

1    the court, they talk about reviewing affidavits from the

2    individuals seeking access, you know, being specific about

3    what they do and what they don't do and why they're not

4    involved in competitive decision-making.

5           And here, we just got a couple of conclusory

6    statements.

7           So I don't know how -- if you want to respond,

8    Plaintiff, you know, I need many of details to decide it the

9    right way.  And they're not here.

10          So I don't know if anyone has anything to say, I'm

11   happy to hear from you.

12          MR. GRAHAM:  Your Honor, if I could respond to that

13   one point, and I appreciate Your Honor's careful analysis of

14   this issue, because it is very important --

15          THE COURT:  Yes, it is.

16          MR. GRAHAM:  -- to the plaintiffs.  The -- in

17   the -- or with the letter we submitted yesterday, we did

18   include some flesh on the bones with regard to Mr. Thallemer.

19   Your Honor may -- the Court may have not have had an

20   opportunity to study that at this point.  But we did have a

21   sense that there may not be enough detail with regard to

22   these individuals.  We did offer that to some extent in a

23   declaration filed by Mr. Thallemer yesterday.

24          THE COURT:  Oh, I didn't see it.  I'm sorry.  But I

25   wasn't here yesterday.  Yesterday was the Court's holiday

1  party and judges meeting.  So I mean, I didn't get a chance

2  to see that.

3         MR. GRAHAM:  I can appreciate that.  But we will

4  certainly take that very seriously and we'll submit

5  appropriate details to allow the Court to make a more

6  informed decision about this issue with regard to both

7  individuals.

8         THE COURT:  Yeah, I mean, I think we should do it

9  quickly.  I mean, the tone of the letters is that you want me

10  to sort of move this along, and I'm happy to do it.  But, you

11  know, rather than just -- you know, I want to make the

12  decision with more facts.  And then I'll make the call as to

13  that.

14         And then I can address the patent prosecution

15  thing, if we get to that point.  So, yes, counsel.

16         MS. MELVIN:  If I may, Your Honor, I do have a copy

17  of the declaration, if Your Honor would like it.  The

18  declaration actually related to a separate issue which was

19  the disclosure of information to Mr. Thallemer.  And I

20  actually don't believe that the majority of the declaration

21  discusses his competitive decision-making.  In fact, there's

22  only one sentence which says I am not involved in the

23  prosecution of any patent applications or any upper-level

24  competitive decision making with either of the plaintiffs in

25  this case.

1          THE COURT:  So, well, I mean let's talk about that.

2    So let's say that's -- I mean, I think the way to dress that

3    up is to say what they -- what the person does do and that --

4    whatever.  But are the defendants, do you know these people?

5    Or you're vigorously opposed to having these two individuals,

6    knowing that I'm not likely to restrict completely -- a

7    complete restriction.  I don't think it's necessary.  I'm

8    very, very reluctant to do it, although I will note that

9    there are cases where it is done, as you know.

10          But what about that?  So what -- do you have

11   information about these two individuals?

12          MS. MELVIN:  We don't have much, Your Honor.  You

13   know, all we have is the same information that Your Honor

14   has, which is that they state that they are not involved in

15   competitive decision-making.

16          We note that with respect to Mr. Reddy, my

17   understanding is Mr. Reddy is actually a patent agent, not an

18   attorney.  My understanding of patent agents is that they are

19   typically involved in exactly the prosecution of patents that

20   we're concerned about, but we don't have more details than

21   that, Your Honor.  And I think that is one of the biggest

22   problems.

23          Additionally, we had this other provision -- you

24   know, as Your Honor noticed -- noted, this analysis has to be

25   done on a counsel-by-counsel basis.  And plaintiffs have also

 1   requested that confidential information be given to any

 2   officer, director, or other person or agent in play or agent

 3   reasonably necessary for the case.

 4        We have asked who they had in mind so that we could

 5   further evaluate that.  But we've gotten no further details.

 6   And we're very concerned about allowing such broad access

 7   when we don't know specifically to whom that information is

 8   going.  It very well could be going to their technical people

 9   who are involved in the development of their products.  It

10   could be going to their patent prosecution -- individuals who

11   are involved in their patent prosecution.  And greatly

12   concerning to us, because, of course, those individuals, once

13   they have the information, they can't unlearn it.

14        THE COURT:  Well, it's true.  But I mean, what you

15   say -- I mean, you know -- I don't know about Reddy, but, you

16   know, when you get to -- you know -- well, we've got to see

17   who's going to have access to the information.  But at that

18   point, you know, I think that defendant has a burden to show,

19   you know, when we talk about patent prosecution bars that

20   might also be imposed, a temporal restriction would be

21   reasonable under Deutsche Bank.  And in the papers, it seemed

22   to me that plaintiff seemed to be willing to accept 18

23   months.  Forever is not reasonable.  And I wonder -- I was

24   thinking somewhere along the lines of two years, when we get

25   to that.  Not really there yet.

1          But I hear what you're saying.  I think we need a

2     little more detailed information.

3          And as to -- sharing it with all the directors and

4     officers, I don't know.  I mean, you know, I didn't see that

5     really fleshed out.  But -- because I thought that plaintiff

6     was saying in the letter -- Mr. Graham, you can correct it if

7     it's not true, that you were -- only wanted -- or you're only

8     really insisting on restricting access for two people.

9          Is that correct?  That's what it seems to say in

10    your letter.

11         MR. GRAHAM:  Yes, sir, that's our -- I think where

12    we are --

13         THE COURT:  Okay.

14         MR. GRAHAM:  -- conceptually with this matter right

15    now.  But there is a lack of definition at this point as to

16    the terms, and so I agree that we need to have a specific

17    document we are working with that has specific language with

18    specific names on it.  And absolutely, we are -- would like

19    to be able to satisfy the Court's need for details with

20    regard to these individuals.

21         I would ask if we could know, since, I obviously

22    had some confusion, after our last meeting, about dates and

23    so forth, when we -- if we could maybe get a briefing

24    schedule that would be put at -- put in place or something --

25         THE COURT:  I'll put it in an order, sure.  But

1   you -- you make up the briefing schedule.  You -- counsel.

2   And if you can't agree, then I will.

3          But those kinds of things I'm going to give you --

4   I mean, you know, we have to move the case along at that it's

5   been around a while with these '15 docket numbers, for lots

6   of reasons.  There's no real criticism, although there were

7   some periods where I don't know what was going on.

8          But that said, I would -- come up with a schedule

9   for that.  That's what -- you know, I have no problem with

10  that.  You do that right there.

11         That's part of the issue.  I mean, I need to get a

12  working document here.  For example, the defendants are

13  talking in their letters about terms.  And plaintiff is

14  talking about two people.  And we've got to sort of get on

15  the same page.  We've got to -- I'd like to see what we're

16  talking about.  So, you know ... I don't know.  I guess you

17  also seem to have a scheduling dispute, but I think that may

18  be resolved at this point.  The letters were from early

19  December.  Right?

20         Yes, what's the story with that?

21         MR. GRAHAM:  On the schedule -- did you want to

22  talk --

23         THE COURT:  We're talking different schedules here,

24  yeah.  I mean.

25         MR. GRAHAM:  Different schedules.

```
 1              THE COURT:  No, as to this issue, I'm going to give
 2    the plaintiff a chance, but I'd sort of like to get you on
 3    the same page where you're -- we're talking about people,
 4    we're talking about terms.  And I'll make a decision.
 5              MR. GRAHAM:  Okay.
 6              MS. MELVIN:  Yes, Your Honor, I would propose that
 7    it sounds now as though -- and plaintiff's counsel can
 8    correct me if this is wrong, but 5 (F), they're no longer
 9    seeking that provision, which is the plaintiff's provision
10    that confidential information should be given to officers,
11    directors and other employees or agents of a party.  So my
12    understanding is they're no longer seeking that.  Plaintiff's
13    counsel can correct me if that is mistaken.
14              So that we've just left to the issue of
15    Mr. Thallemer and Mr. Reddy.  So we would propose giving
16    plaintiffs, perhaps, two weeks to submit a declaration on
17    behalf of those individuals, and then providing two weeks for
18    plaintiff -- for defendants to respond --
19              THE COURT:  Yeah.
20              MS. MELVIN:  -- if that's reasonable with the Court
21    and acceptable to plaintiffs.
22              THE COURT:  So we're talking about two individuals,
23    let's be clear.  And I'd like to -- or would -- how do you
24    feel, assuming that access is allowed, that there be a
25    two-year patent prosecution bar?
```

1          MR. GRAHAM:  Your Honor, that's not a problem at

2   all with us, because these individuals were not involved in

3   this particular technology prosecutionwise.

4          THE COURT:  How about defendants?  How about two

5   years?

6          MS. MELVIN:  I think that would be acceptable,

7   Your Honor.

8          THE COURT:  Okay.  Good.  We're making some

9   progress.  And I think your two-week schedule's good.  But

10  I'd like someone to put it in a letter or I can so order or

11  in an order, for you to respond, so that we have -- we have

12  that all going, which would be very helpful.

13         Now, another issue was raised with -- excuse me for

14  a second.  I want to just go off the record and I'll talk to.

15     (Pause in proceedings)

16         THE COURT:  Yeah, I mean, my career clerk,

17  Mr. Conlon, who has tremendous experience in this area too,

18  just wonders whether we can really just have a deal.  In

19  other words, would defendants be agreeable to the -- based on

20  the assertion that they have nothing to do with patent

21  prosecution or anything like that, would you be -- and since

22  it's not going beyond that, we have two individuals in two

23  years, can we have a deal without having papers?

24         MS. MELVIN:  Your Honor, this is Emily Melvin for

25  Roxane.  We do have an additional concern, which we have

1  raised in the letters, and I'm happy to go into more detail,

2  if Your Honor would like, but that is that we now have two

3  instances of what we view as the improper disclosure of

4  Roxane's confidential information: one to Mr. Thallemer,

5  which Mr. Thallemer submitted a declaration last night.  I

6  was on the call that was at issue.  And I disagree with the

7  version of events that was set forward.  I'm happy to discuss

8  that more, if Your Honor would like.

9          And the second instance is that there is a

10  Ms. Golaris [phonetic], who is apparently outside counsel but

11  is not admitted pro hac vice, and we learned just within the

12  last few days that she did receive some of Roxane's

13  confidential information, even though she has not be

14  admitted.

15          So we do have some concerns with respect to

16  Mr. Thallemer in light of the declaration and the fact that

17  it doesn't accurately reflect the events of the call.  So we

18  would like some time to further consider that.  And I do

19  think the briefing schedule would be appropriate in that

20  regard.

21          THE COURT:  All right.  I mean, that's fine.  I

22  mean, that would -- yeah.

23          You're saying this third person?  I didn't really

24  follow that.  This woman?

25          MS. MELVIN:  Yes.  So, Your Honor, I believe -- my

1  understanding is that she is outside counsel for plaintiffs,

2  but she was not admitted pro hac vice, and we were not aware

3  that she was receiving our confidential information in any

4  way.  And we just learned within the last few days that she

5  has, in fact, been given our confidential information.  We

6  understood last night that plaintiffs were intending to seek

7  her admission pro hac vice, but now we understand that may

8  not be the case.

9         So it is -- it is a concern.  We think that, you

10  know, before confidential information is given to any counsel

11  or any person, we need to go through the steps of admission

12  pro hac vice or otherwise, the other appropriate steps under

13  whatever DCO we agree on.

14         THE COURT:  Well, I have no problem with that.

15  That would be the terms and the viol- -- you know, an issue

16  of the DCO.  I just was trying to get down to make it a deal,

17  you know, to see that we could do that.  And -- I mean,

18  because I guess you're claiming that there's been violation

19  of -- at this point.  Is that what you're saying?

20         MS. MELVIN:  Yes, Your Honor, that is our

21  contention.  And we have been attempting to speak with

22  plaintiffs about this for the last several months.  And

23  frankly we are concerned about Mr. Thallemer's access to

24  information in light of the fact that Wolf [phonetic], the

25  other attorney for Roxane and I, who were on the call,

1  disagree with his statement of the events that took place.

2  And, in fact, some of the facts in the declaration that we

3  allegedly revealed are not even accurate about Roxane.  So

4  it's clearly not accurate of what was said on the call.

5           THE COURT:  No, I hear you.  And I don't know if

6  that -- and I'm not -- I'm not cutting you off.  I haven't

7  read it.  I don't know.  It seems to me a different issue.

8  I'd like you to strongly consider whether we can agree

9  without too much further argument -- I'm not forcing you to.

10 You can certainly have more time, and we can put the order --

11 you know, the sort of, quote, briefing order in place.

12          But what you've said doesn't seem to change the

13 fact that -- I mean, they have a sort of restrictive

14 position -- I mean, nonrestrictive or a limited position of

15 two people and two years that they've represented have

16 nothing to do with patent prosecution or competitive -- or

17 this product area, shall we say.

18          So I would like to see if that could be worked out

19 as a deal.  I think that would be a good one.

20          MS. MELVIN:  Well, I think, Your Honor, in order

21 to -- before we're able to reach a deal, I think we would

22 like some sort of declaration from Mr. Thallemer and

23 Mr. Reddy detailing exactly what their positions are so that

24 we can further consider it, because at this point, we've had

25 heard that they're not involved in patent prosecution, but

1   there is -- there are other competitive decision-making

2   issues that could be involved as well.

3            So it very well may be that plaintiffs provide the

4   declarations and then we withdraw our objections.  But I

5   think we need to see those declarations first.

6            THE COURT:  Fair enough.  I mean, then that's what

7   we'll do.

8            Now, I know that the letter submitted last night

9   really didn't go to the issue that we're -- you know, to the

10  DCO.  But it's about -- there's mention of samples and

11  vil- -- I mean, I thought I had said at one point, you should

12  get the samples.  No?

13           MS. MELVIN:  Your Honor, we -- from Roxane's

14  position, we've informed plaintiffs that we are working with

15  our client to figure out how much they have and how much

16  we're able to give them.  They've requested an extremely --

17  what from our view is an extremely large amount, so we're --

18  in our view, we're still working that out.  We're working

19  with the client.

20           THE COURT:  Okay.

21           MS. MELVIN:  We don't think it's ripe for the

22  Court's intervention.

23           THE COURT:  You feel differently, Mr. Graham?

24           MR. GRAHAM:  Oh, quite differently, Your Honor.

25  But, again, we consulted with our expert.  We don't -- tests

1    are expensive.  Our client doesn't want to do any more tests

2    than it has to.  So we have no motive or incentive to try to

3    get more material than we need -- than our clients need to

4    test this material to find out, you know, a number of things

5    about it and to do it in the right way so that we are assured

6    that it's -- accurately represents the material.  You know,

7    we consulted with our expert about that, and we've done quite

8    a bit of work actually to determine the appropriate amount:

9    30 grams, which is about an ounce, from each of these reserve

10   samples that the FDA requires be maintained.

11         There's a lot of detail in that, Your Honor.  I

12   don't know if you want to get into all of that.

13         THE COURT:  No.  And I'm not prepared to.  I

14   understand the issue.  But I think you should continue to

15   work it out.  I mean, we've got to get there.

16         MR. GRAHAM:  We're trying.

17         THE COURT:  You're entitled to samples, as far as

18   I'm concerned.

19         I understand the other side.  You know, sometimes

20   there's a limited number left or that can be found that would

21   be appropriate and I -- but you need to talk to one another

22   and work it out and move it along, because the cases are

23   going to start getting old.  And you're going to have a lot

24   of, you know, battles.  I can see it already.

25         MS. MELVIN:  Yes, Your Honor.  We're prepared for

|Hearing
|15-cv-08304, 15-cv-08307, 15-cv-08306, December 16, 2016

```
 1   that.
 2              MS. VYAKARNAM:  Your Honor.
 3              THE COURT:  Go ahead.  Okay.
 4              MS. VYAKARNAM:  For Amneal, we've already offered
 5   them samples.
 6              THE COURT:  Oh, good.
 7              MS. VYAKARNAM:  But the issue is just the
 8   quantities.
 9              THE COURT:  The quantity.
10              MS. VYAKARNAM:  We also -- the quantity they asked
11   of 30 grams is large.  And we've offered to give them 5
12   grams, and we've talked to our experts, and we think that's a
13   fair amount, and they should be able to do the testing
14   needed, you know, more than a couple of times with that
15   amount, but, you know, we're just waiting for them to agree
16   to that amount, and we're ready to ship our samples to them.
17              THE COURT:  But let me just ask you -- and I don't
18   understand enough about the strategy on something like this.
19   I mean, okay, I hear what you say.  And maybe -- you know, I
20   think frankly, Plaintiff, you should consult with your expert
21   and request the minimum amount that an effective testing can
22   be done.
23              But I'm now going back to Amneal, is your offer of
24   5 grams, is there some strategy to that?  Or you simply don't
25   have it or it's -- I mean, what's the reason?  Why not just
```

1    go along with -- I mean, is there ...

2             MS. VYAKARNAM:  One of the things that plaintiffs

3    referred to as saved for the FDA purposes are exactly that.

4    They're saved for the FDA purposes.  We can't really take

5    that, a big chunk of that amount, reuse it for litigation.

6    So of course, they're limited in the quantities.

7             And from my experience in other cases, 5 grams is

8    already more than what we typically give for these kind of

9    testing.  So it's more than sufficient amount.

10            And plaintiffs have requested samples of each and

11   every lot --

12            THE COURT:  Yeah.

13            MS. VYAKARNAM:  -- which is a lot too.  I mean,

14   they haven't given us a good reason for why they need each

15   and every lot.  And they haven't even told us if they're

16   going to test each and every lot.  We want to know if their

17   position is going to be they need to test every lot to prove

18   an infringement in each lot.

19            THE COURT:  Yeah.  Yeah.

20            MR. GRAHAM:  Your Honor, if I could speak to that

21   and just repeat what I had mentioned before.  Our clients

22   have no desire or incentive to want to test any more material

23   than absolutely necessary.  They have no reason to want more

24   than they need.

25            One thing that would help this quite a bit, I

1    believe, is if we could get information from the defendants

2    as to how much they have.  And, you know, we'll receive that

3    confidentially or whatever.  But, you know, we're shooting in

4    the dark here, because we asked for 30 grams.  We understand

5    that conventional in the industry is 500 grams, which is a

6    little -- about a pound and a half or a little more than a

7    pound from each big, large batch of pharmaceuticals.  That is

8    conventional.  That's what people use as their amount for

9    retained samples.

10            So we think that 30 grams is what we need to do the

11   test.  We don't think that's inordinate percentage of the

12   total.

13            But, again, we don't know how much they have, and

14   they won't give it to us, because they say it's not

15   necessary.  We tried to explain our reason for wanting to

16   know how much they have because they say it's too much of

17   what we -- our client has, but how do we know that?  We don't

18   know how much their clients have, and they won't tell us.

19            So we're doing our best, Your Honor, to try to

20   reach on agreement on these amounts.

21            THE COURT:  Well, I'd like you to meet and confer.

22   I think you should be able to work this one out.  I'm sorry

23   if you can't.  I don't know what I would do.  I'd get

24   affidavits from the experts on both sides and --

25            MR. GRAHAM:  Yes, sir.

1        THE COURT:  I mean, I don't know what else.  You

2  know, I'd have to make some kind of a call.  Probably

3  wouldn't be the most informed call, but ...

4        MS. VYAKARNAM:  Your Honor, our position is that

5  they're not entitled to discovery on how much we have from

6  each and every lot that we've ever --

7        THE COURT:  You may be right on that.  I don't see

8  that as being relevant.  I mean, it might be helpful, because

9  I'm curious to the decision, but I agree with you, that

10  that's not really discovery that is relevant to the issue.

11        But I'm trying to help you -- to sort of come to an

12  agreement on this.  If you want me to make a call on it, I'll

13  make a call on it.  You'll give me expert certifications and

14  do the best I can.

15        I mean -- and with that, I may want to know how

16  much you have, as a matter of fact; perhaps even for *in*

17  *camera*.  But I mean, you know -- although -- I mean, if

18  that's a really serious concern, we do the best we can.  But

19  I mean, if plaintiff's expert is saying, that's the minimum

20  they need to test, I don't know, how do you decide that?  How

21  would you decide something like that?  I mean, I'm not

22  trained in science.  I can hear from both sides.  A

23  credibility decision?  I don't know what to do.  I don't mean

24  I don't know what to do.  That's what I would have to do is

25  make the best decision, if you can't do it.

1          But I really at this point I want you to kind get

2   together and start cooperating a little, not that you haven't

3   been, but I'd like to see the samples, meet and confer on

4   that, follow up on it.  We'll get the affidavits.  I'm hoping

5   for a potential deal on the discovery confidentiality order.

6          I think we need a proposed new scheduling order.

7   I'd like you to confer on that.  And if it's something that

8   you have disputes on, I will, you know -- what?  You know, I

9   think that's something that we need.  Like there was a

10  dispute about something in December, on December 12th, I

11  think, it was.  I think -- but that's past.  I mean, is that

12  what you're talking about?

13         MR. POULLAOS:  That's right, Your Honor, I can talk

14  to that, if you --

15         THE COURT:  Is that still a dispute?  Or are we

16  past that?

17         MR. POULLAOS:  Well, in the sense that the schedule

18  Your Honor just entered has a December 9th date that passed,

19  we weren't able to provide our evidence opposing their

20  proposed claim constructions, the plaintiff's proposed claim

21  constructions, because we didn't have their constructions.

22  So it was impossible for us to meet that date, which is why

23  we, you know, short of asking that plaintiffs have waived

24  their claim construction positions, what we did is we

25  submitted a letter asking for those dates in December to be

1    advanced, because plaintiffs had not given us their

2    constructions.

3              And so that's where we are right now.

4              THE COURT:  But where are you right now?  I mean,

5    is it on consent, or is there a dispute?

6              MR. POULLAOS:  Right now, it was on consent.  And

7    actually today is the day that the parties had agreed to

8    exchange opposing evidence.  We're ready to do so.  I don't

9    know if plaintiffs are.  If you want to push that out a

10   couple of days as well, that's -- we can talk about that.

11             But what our schedule does is provide for that

12   disclosure to take place today, and then the other deadlines

13   on the Markman schedule were kicked out a week.  Everything

14   else remains the same.

15             THE COURT:  So I mean, this proposed sixth amended

16   scheduling order is -- we have it.  I mean, should I enter

17   that?  Is that what --

18             MR. POULLAOS:  Unless you need to -- more

19   extensions.  I don't know.

20             MR. GRAHAM:  Yeah, because I -- we've had a

21   misunderstanding about that, because we thought we were

22   already operating under the fifth -- we had filed a letter

23   saying we agreed with that.  And so I thought we were under

24   the new dates.  I wasn't under the impression that anything

25   was due today in regard to --

Hearing
15-cv-08304, 15-cv-08307, 15-cv-08306, December 16, 2016

1          MR. POULLAOS:  That's one of the new dates.

2  Your Honor, this is -- honestly, this is one of the problems

3  that's been happening.

4          THE COURT:  I know, but I want to get an operative

5  scheduling order and then live by it, if I can.

6          MR. POULLAOS:  All right.

7          THE COURT:  Okay?  But there seems to be a

8  misunderstanding here.

9          MR. POULLAOS:  I think the only misunderstanding

10  right now is on that December 16th date, the date today for

11  exchange of evidence.  So if you want to agree on a Tuesday

12  or --

13          MR. GRAHAM:  That's fine.  That's fine.

14          MR. POULLAOS:  -- whatever it is.

15          MR. GRAHAM:  Tuesday's fine.

16          THE COURT:  Tuesday.

17          MR. POULLAOS:  So that December 16th date would be

18  December 21st, and that's in the sixth amended.  So --

19          THE COURT:  But I mean, you're referring to the

20  fifth consent -- the amended scheduling order.  Right?

21  There's --

22          MR. GRAHAM:  We had actually indicated we agreed

23  with the sixth --

24          THE COURT:  The sixth, you agree.  So everyone

25  agrees.  It's on consent.

1          MR. POULLAOS:  With one proviso, paragraph 5,

2    December 16th will be December 21st.

3          THE COURT:  Okay.  We'll deal with that.

4          Is there anything else I can deal with right now?

5    Okay.  Anything else right now, counsel?

6          MR. GRAHAM:  I want to apologize, Your Honor, for

7    my tardiness.

8          THE COURT:  No, I understand.  Traveling's tough at

9    this time.  It's okay with me.  It's to your colleagues, and

10   I'm sure they'll accept your apology.

11         MR. GRAHAM:  And I want to apologize for November.

12   I had pneumonia twice.

13         THE COURT:  I'm sorry to hear that.  Yeah, I'm very

14   sorry.

15         MR. GRAHAM:  So it was kind of difficult to keep up

16   with things.  But hopefully with better communication, we can

17   move this forward, because we certainly have -- we're being

18   encouraged by our client to move it forward.

19         THE COURT:  I'm sure you are.  Well, I wish you

20   good health and all good health and happy holidays.  And be

21   in touch with me if there's a problem.  I'm going to try to,

22   you know, be active on the case.  Okay?

23         UNIDENTIFIED SPEAKERS:  Thank Your Honor.

24         THE COURT:  Is there something else?  They're going

25   to submit that to me.  Oh, you mean the dates?  Yeah, I

Hearing
15-cv-08304, 15-cv-08307, 15-cv-08306, December 16, 2016

1   want -- I mean, you're going to submit the dates for this

2   affidavit business.  Right?

3           MR. POULLAOS:  We're going to submit a letter

4   outlining the schedule.

5           THE COURT:  Soon.  Right?

6           MR. POULLAOS:  Yes.

7           THE COURT:  Real soon.  I mean the letter.  You

8   know, I don't know about the dates, because we're going to

9   reach a deal.  Take care.

10          (Conclusion of proceedings at 1:01 P.M. )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3   that the 36 pages contained herein constitute a full, true,

4   and accurate transcript from the official electronic

5   recording of the proceedings had in the above-entitled

6   matter; that research was performed on the spelling of proper

7   names and utilizing the information provided, but that in

8   many cases the spellings were educated guesses; that the

9   transcript was prepared by me or under my direction and was

10  done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12  the parties hereto nor am I in any way interested in the

13  outcome hereof.

14

15

16

17

18  S/ *Sara L. Kern*                    11th of January, 2017

19  _____    _____
    Signature of Approved Transcriber              Date

20

21

    Sara L. Kern, CET**D-338
22  King Transcription Services
    3 South Corporate Drive, Suite 203
23  Riverdale, NJ  07457
    (973) 237-6080

24

25